Court. Good morning. May it please the court. My name is David Abney. I represent Armando Nieves Martinez, his wife, his son, and his daughter. I would like to reserve about five minutes of time at the end for rebuttal. Okay. We'll try to help you. Thank you for the opportunity to speak with you today. To me, this is a fairly simple case. I don't know how it got off the track so badly. The magistrate judge reviewed the facts very carefully and did a long written report which was adopted as far as all the facts by the district court. So there's really no dispute about what happened. A gentleman, his wife, son, and daughter decided to come over from Sonora to go up to Chandler, to the Chandler Mall to do some shopping. He had about three thousand United States dollars with him. He had done this before. They were not trying to sneak into the country or do anything wrong. He was a very prosperous farmer. He raises grapes in Sonora and he trades in the grapes that he raises and in other raisins. He sells raisins and is very prosperous. Makes several million dollars a year. He was coming to the United States for our benefit. He was going to be spending money in our stores. I don't have the facts. Thank you. Can you jump to whether there was a constitutional violation that might be an exception to the discretionary function exception? I mean, the dog alerted to the car. They found, they may have bungled the test, but they found, they tested positive for methamphetamine, windshield wiper fluid, etc. and he confessed. So they brought him to the magistrate judge. So explain what the constitutional violation is here. Well, the constitutional violation is that you are not allowed to essentially torture somebody who's visiting our nation to get a false confession. There wasn't any evidence of torture, correct? There was aggressive questioning by Mr. Casillas. I mean, there was no physical abuse. He wasn't whipped or put in chains and given electroshock. So let's be careful with the terminology here. I think I'm being careful, Your Honor. There can be torture psychologically that is just as bad as any physical torment. This man was told over and over that his wife and his son, who has dyslexia problems, would be imprisoned in Kentucky for 30 years if he did not confess. But was he told his rights? Was he told he could have counsel and given his brand of rights? I believe he was, but then again, I do not believe he did, Your Honor. But I submit to the court that doesn't end the psychological torment, and I will call it psychological torture. If you go to that extreme of threatening his wife and his son, and then they threaten the daughter, too. They threaten, well, your daughter is going to be taken away from you and placed in foster care in the United And here he is being told over and over that this is what is going to happen. Litigated as part of the case, but was there compliance with the Vienna Convention? I don't think that ever came up, Your Honor. Okay. I suspect that means there was not. Yes, Your Honor. Are you familiar with the Vienna Convention? Yes, I am. And if this were, I was in the Navy for a while. If this were the Geneva Convention, I think this would be a violation of that as well. But apparently this was not made part of the case. I've got a question with respect to discretionary function. I think it's fairly well established in our law that if the policy is clear, but then the policy is executed improperly, the improper execution of the policy doesn't come within the discretionary function exception. And the magistrate judge found three negligent or improper implementations of policy. The first two are the ones that strike that have attracted my attention. The first one is apparently there's evidence from the plaintiff's expert that the dog alert wasn't handled properly. And the second is that despite the very clear instructions with respect to the test kit, the wrong kind of towel was used. Are those two things protected by the discretionary function exception? I do not believe so. You have discretion to do a canine search, but you have to do it in accordance with proper policies and procedures. You have discretion to do a field test, but you have to do that in accordance with proper policies and procedures. And in this case, follow directions on the box. What's the evidence in the record that show that the dog search and the test were performed improperly? From the expert, our experts said they were performed improperly. And that expert testimony was never disputed. The government never presented its own expert to say that this was done properly. Independent expert. The dog handler says everything is fine. What's this? Both? One or the other? You follow me? If I understand the question, the procedures were not followed properly for the field test and for the canine search. Right. Now I'm asking much more specifically the evidence that you have. I understand you have an expert that says the dog search was performed improperly. What's the evidence that the test for the drugs was performed improperly? Was that from the expert or was that from something else? I believe that was from an expert. It was it was given as a it was accepted as a fact in the magistrate reports that both of these searches were not done according to proper protocols. So that's really a. So are you those procedures or policies are mandatory? As far as the proper procedures to use for the canine testing in the field testing? Yes, Your Honor. You're not just allowed to go out there and take a dog near a vehicle and let it go. There's certain there's definite policies and procedures to follow. And then with a field test, there's definite things you have to do. As I said, in this case, it's really follow with all the instructions on the box and you're home free. And I appreciate Judge Fletcher, your concern about the the testing, the canine search and the drug test, the field test. What has bothered me most about this case? And maybe I'm off beam, but it's what I refer to Judge Akuta as as torture. I can't imagine putting a parent in a worse situation than than what this man was put into. And he he believed they made him believe they yelled at him, screamed at him, isolated him, brought his members of his family and separately and and and made sure that he felt the maximum amount of pressure. I can't imagine what would be worse for a parent than to think that that your spouse, that your son, your daughter is going to be ripped away from you for 15 to 30 years. I mean, what what else would you do but confess falsely and how anybody could look at this and say this is not intentional infliction of emotional distress baffles me. Now, that went to the jury, correct? Well, this is since it's a FTCA case, it was considered by the district judge and and the district judge said, no, this this is an intentional emotion, infliction of emotional distress. That I believe is an abuse of discretion. Didn't that question go to the jury? It wasn't there a jury trial on that question? I don't think so. It's an FTCA case. Oh, so it's it's just trying to the court. I'm mixing that up with another case. I apologize. I mean, if it were if we were in Arizona State Court, knock on wood, of course, we can't get there because it's an FTCA case. But if we were in Arizona State Court, this would all be all be jury questions. The actual common law elements, the assault, negligence, gross negligence, false imprisonment and intentional infliction of emotional distress never got any any focus treatment by the district judge. The only one only one that she was concerned with was the intentional infliction. The other ones she wiped out, said the discretionary function gets rid of all of those common law causes of action except for intentional infliction of emotional distress. I said jury trial. That was a bench trial on inflection, emotional distress. Correct. So you're just saying that's against the weight of the evidence. Absolutely, Your Honor. I do not see how any reasonable juror could ever reach any conclusion other than this is intentional infliction of emotional distress. They they did what they wanted to do, and they did it brilliantly. I mean, you can take an interrogator from any area in history in any country you want to choose. These people did a great job, all with psychological torment or psychological torture, if I may use that term without stepping on anybody's toes. This is not the way we're supposed to do things in this country. Yeah. And my my brief to the court, I have to say that I've been dealing with criminal cases now for over 20 years. And I see an awful lot of aggressive interrogation techniques, most of which I think are legal, some of which I think are legal, but but but nonetheless, sort of borderline or improper. This might have been grounds if the confessional relied on a criminal case to support a conviction or not to set it aside as involuntary. But this is, I'm afraid to not uncommon law enforcement behavior. That makes me sad, your honor. It really does. Because, I mean, we're here to defend the rule of law. And, you know, to see our officers do this sort of thing, it just it breaks me up. This is not the way we're supposed to act in this country. They didn't physically brutalize. Judge, I put it. You're absolutely right. There was not the physical kind of abuse, although isolation can be very wearing of itself. But to threaten somebody with this kind of thing is is beyond any border we might have any gray area. It's so far that extreme that it's something that it should be considered on the merits and decided as to whether this sort of thing is wrong. And it is wrong. This is a violation of the rule of law. I mean, we've all had a very bad year. But the one thing that has given me some some joy and hope is with all these election contests in court after court after court, judges of every political persuasion have thrown them out based on the rule of law. And that's what we've got here, the rule of law. That's that's what I'm advocating for. OK, I'd like to reserve the rest of my time. You're down to a little over four minutes to save the time and we'll have on the other side. Thank you, your honor. Thank you. OK, thank you, your honors. May it please the court. I'm Dennis Bastian for the United States. I'd like to start by addressing Judge Fletcher's question about whether alleged negligence during the canine alert and alleged negligence during the field test is cognizable under the discretionary function exception. And it is not cognizable under the discretionary function exception. The discretionary function exception applies broadly in FTCA cases arising out of law enforcement investigations. And so if all plaintiffs can offer our claims of negligence or that officers were incompetent or abusive or that they just did bad police work, those cases are going to be barred by the two part test in the discretionary function exception. And Mr. Abney, Mr. Abney said that the things that weren't followed were mandatory, that they were mandatory policies or procedures. And if they are mandatory, then it wouldn't fall under the discretionary function exception. So can you address whether they're mandatory? There were no mandatory legal provisions identified in this case that the Border Patrol agents allegedly violated. The basis of the canine handler was brought by the Nieves family's canine expert. Now, this is an issue at summary judgment that was resolved at summary judgment that was not raised in the opening brief. But the canine expert's opinion was rejected by the district court because the district judge concluded that the canine expert's opinion was speculative and lacked foundation. There was no argument in the opening brief that the district judge erred when she declined to examine the canine expert's opinion on that. There were no mandatory statutes, regulations, or policies that specifically prescribed the course of action that had to be followed that were allegedly violated in this case. What about the field testing of liquids policy that wasn't followed? There was no policy. I think the opposing counsel is referring to the instructions on the test kit and it's not all that clear that the instructions on the test kit were not followed. But that would be a negligence type theory. When you get to the second part of the discretionary function exception test, the policy judgment problem, that applies differently in law enforcement investigations than it does in other cases. There are cases like premises liability cases or professional malpractice cases where the United States can be sued for ordinary negligence. But in those cases, the court will apply what's called the design implementation distinction. And the design implementation distinction originates from a 1955 Supreme Court case called Indian Towing. And this was the main disagreement between the magistrate judge and the district court judge. When the district court judge rejected the magistrate's report and recommendation, she identified two cases where this court, the Ninth Circuit, has rejected the Indian Towing in these cases involving law enforcement. And those are the Gonzalez case and the Alfrey case. In Gonzalez, this court referred to the design implementation distinction by name and expressly rejected that it applies in cases arising out of criminal or quasi-criminal investigations. Same thing in Alfrey. In Alfrey, the plaintiffs tried to rely on Indian Towing. The night this court in Alfrey expressly rejected Indian Towing and held that Indian Towing and the design implementation distinction don't apply in cases arising out of law enforcement investigations. In those cases, I'd like to ask Judge Schreyer's question, but in a slightly different form. In order to detain Mr. Nieves Martinez, they needed some form of probable cause. And in order to get probable cause, you've got to have something underlying it. And that's mandatory. And their probable cause was the alerting of the dog and the testing of the fluid. So they had to do something and they were required to do something. And what they did was they had the dog alert and they tested the fluid. If they did that improperly, that strikes me as that does not come within the discretionary function exception. Well, I'd like to make two points about that. First, when we evaluate police work, we don't use hindsight. We do it from the perspective of a reasonable law in the same or similar circumstances. The second point I'd like to make is that the district court had a basis. The district court had really three bases for dismissing the false imprisonment claim, which, of course, requires a lack of cause. One was the discretionary function exception. But another basis was that Mr. Nieves Martinez had a preliminary hearing. And at the preliminary hearing, the magistrate judge in his criminal case found that there was probable cause to arrest him. And in a civil case, and that probable cause was found based upon the test that revealed the presence of drugs in the correct and the and the apparent confession just turns out to have been inaccurate. And according to the plaintiff's evidence, improperly performed. But there's an important point to make here. And this was not raised in their opening brief. But the district court judge central to her order granting summary judgment on the false imprisonment claims relied on the probable cause finding in the criminal case. In general, when there's a probable cause finding in the criminal case and probable cause is an element in a subsequent civil case, there's a presumption that the probable cause indeed existed. And in order for a plaintiff to rebut that presumption, the plaintiff has to show some kind of judicial deception in obtaining the probable cause finding. So in the at summary judgment, the district court looked at the affidavit of probable cause that was in front of the magistrate in the criminal case, and concluded that there was no evidence of judicial deception. And so that was another basis for dismissing the false imprisonment claim. And that so so the there was there were a lot of issues resolved at summary judgment that were not raised in the family's opening brief. And that was one of them. One of the reasons the false imprisonment claim failed was because of this presumption of probable cause. And the district held that there was no evidence of judicial deception. The Navis family did not appeal that in their opening brief or mention it in the report. It's hard for I, this is not a rebuke, it's hard to over in person, it's easy to understand when the judge wants to ask the question. It may be that false imprisonment stands on a different footing before and after the hearing in front of the judge as to whether there's probable cause to continue the imprisonment. The period before that, the only thing they were relying on is the dog alert and the test that was according to the plaintiff's evidence improperly performed. Well, we so what so what do we do about the period before that it goes before the judge? Well, in order to get to the merits of the claim, you still have to get past discretionary function and you still have to to show evidence that the probable cause was obtained through judicial deception. Well, no, not not not. There's there's nothing the judiciary is not involved at the time I'm now talking about. I'm talking about the dog alerts. They perform the test. Both of them improperly performed according to the plaintiff. And at that point, all kinds of things happen long before we get to a judge. And if there was no probable cause, those things were improper. Well, OK, let me start with the canine alert. When a trained canine makes an alert, there's probable cause at that point to search and to continue the investigation, including the arrest. Now, the canine expert, the family's canine expert, his opinion was rejected by the district court. The district court did not consider it. So there was no evidence that the canine didn't alert. You had you had a trained canine officer with his canine. They had just been certified. The canine alerted twice to the vehicle. That gives probable cause for what happened next. Well, the question and the same thing with the question as to that was not the alert, but the manner of the alert. And the district judge may or may not have been right to say that the newest Martinez expert was was speculative. But there are various there are various kinds of alerts. And I have to say I am far from an expert on canine alerts. Well, the rule from this court and the Supreme Court is that if a trained canine team has an alert, then that gives probable cause. And that's what happened in this case. And there's really no there was no admissible evidence in the contrary, because the only evidence that they that they used to attack the canine alert was their own expert. And the district court declined to consider his opinion. That particular part of the district court order was not was not appealed. And so so I'm going to get back to the policy judgment prong. This court has routinely held that decisions made during a law enforcement investigation are always susceptible to policy analysis. So in these cases like Gonzalez, Alfrey and then Sabo, every decision made in furtherance of the investigation was protected by the discretionary function exception. The question in this case was really what is the limiting principle in this policy judgment prong? Because there was no evidence of a constitutional violation. There was no mandatory legal provision that was allegedly violated. And so when you get to this, this part of the analysis, the policy judgment prong, where's the limiting principle? And the limiting principle comes from in Sabo. One of the things the court looked at was that there was some coercion towards the brother, Dr. Sabo, when they were threatening to take away, try to take away his medical license. And that there was no legitimate policy rationale for the threats that were made towards him when they were talking to him. So what is the legitimate legitimate policy rationale for the threats and false statements that were made towards the plaintiff in this case to try to get him to confess? Two things, Your Honor. First, Sabo is the case from this circuit that draws the line. And General Adams' conduct toward Dr. Sabo was totally unrelated. And I'll tell you, it is Sabo. I actually know Mr. Sabo. Oh, I'm sorry. I'll pronounce his name better. Mr. Sabo, that's right. He was a doctor from South Dakota, I believe. But Dr. Sabo, when General Adams locked Dr. Sabo into a meeting room and berated him, that had nothing to do with the investigation. And when General Adams threatened to go after Dr. Sabo's medical license, that had nothing to do with the investigation, and it was solely for an improper purpose. And I think that's the line. When officers suddenly, they're doing something solely for an improper purpose, unrelated to the investigation, that's when you lose the discretionary function exceptions protection when you're on this policy judgment prompt. But broadly speaking, an officer's purpose should be to enforce criminal laws and to bring offenders to justice. And that was the purpose that Agent Casillas had. I mean, this case was tried, or this claim was tried. So the district judge made factual findings, and the district judge found that there were no derogatory remarks about Mexicans. That did not happen. The district court found that Agent Casillas' only motivation was to elicit a confession, which is related to stopping, it is related to enforcing criminal laws and bringing offenders to justice. The district court found that he had no malice and there was no improper purpose. Those are all factual findings from the claim that was tried. So this court can only set those aside for clear error. It has to view the evidence in the light most favorable to the prevailing party on that part of it. And it has to affirm if there's any basis in the area, or if the judge's findings are plausible in light of the record as a whole. So broadly speaking, the purpose was to enforce criminal laws and to bring offenders to justice. And that is the proper purpose for officers. The court, in its legal analysis, identified Sabo as drawing the line. And of course, in Sabo, General Adams did something totally unrelated to the investigation, solely for an improper purpose. The other case from this court that's relevant is Gasho. And in Gasho, this court used the word malice. It may not be clear whether when the court used the word malice they were doing their discretionary function exception analysis, or whether it was a different question. But malice is one possible standard for when you're in this policy judgment prong, agents cross the line. However, this court, or the district court, said whether the standard is malice or whether it has to be conduct even worse than that, like Sabo, there was no conduct like that in this case. And that's why the discretionary function exception applied. I want to make one point about the assault claims. It was not our argument below, and it's not our argument here, that the assault claims are barred by the discretionary function exception. Our argument at summary judgment was that there just was no assault. In Arizona, to have an assault, you have to have something much, much closer to a completed battery. If someone takes a swing at you and misses, that's an assault. If someone draws a weapon, that's an assault. It's got to be something much closer to a completed battery, and there was no evidence of anything like that in this case. The Nieves family members claimed vaguely that they felt threatened, but just making some vague claim that you feel threatened is not enough. There has to be something much closer to a completed battery. And at their depositions, and this was part of this different record, so the deposition testimony is the record, the Nieves family members were asked questions like, did any agent ever make a move to strike you? Did any agent threaten you with a fist or weapon? Did you ever feel that an agent was about to hit or strike you? Every time a Nieves family member got that question, they answered no, and that's why there was no evidence of an assault. And I see my time is up if there are no more questions. Thank you, and we respectfully request that the court dismiss or affirm all parts of the appeal. Thank you very much. Mr. Abney, back to you. Thank you, Honor. Both the father and the son testified that they felt that they were in fear of being hit, and that in Arizona is an assault. All you have to do is imminent fear of an unconsented, offensive touching, and you've got assault. And for intentional infliction of emotional distress, we fit all the parameters of that. For false imprisonment in Arizona, common law at least, you need to show that someone has been illegally or unlawfully detained without their consent. There's enough here that reasonable jurors could say that they didn't have any basis for it. I don't think we should ever lose sight of the fact that there were no drugs in the washer fluid, none at all. It took the government a long time to do a real test on it at a real lab. And even when they did that, they went back to the vehicle and basically took it apart, x-rayed it, examined it minutely. There was no hint anywhere of any kind of illegal importation of drugs or any effort to do anything legal in our country. Just a family coming to shop in Arizona. That was all it was. And yet he was in prison for 40 days because of this. And no apology, just released and have a nice day. That's not how things are supposed to operate. As far as something unrelated to the investigation, sure, interrogation is online and engage in this kind of extreme coercion. It's not just being aggressive, not just being inventive and tricky. Those things are allowed. This is so far beyond when you're when you're when you this man is in tears because he thinks, honestly thinks this is what he testified. His wife and his son were going to be in prison for decades, and his daughter was going to be taken away and placed in foster care in the United States. He was terrified about that, and he and his wife decided that he would take the blame. He would take the blame for this, even though they didn't do anything wrong. There's no hint he did anything wrong and confess. You know, that's not that's not really related to an investigation that's related to a desire to nail somebody for anything. Doesn't matter how you do it, just get them. That's not how law enforcement officers are supposed to operate, not in this nation. In other nations, that's how they do it. But here that's not right. And I know Judge Fletcher that you've you've seen instances like this and even worse, and probably every member of the panel has seen instances like this and worse. But some at some point we have to say all the fancy language about discretionary function really boils down to you can't do things that are unconstitutional. And in fact, I think at oral argument, the magistrate judge noted in her at ER ER 61 at oral argument, the government conceded that agents do not have discretion to violate the Constitution, which is what the plaintiffs allege here. And they don't. They never have. And I hope they never will. Coercing a confession. Coercing. Well, there can be very fine distinctions here, Your Honor, and I understand that. But sometimes, you know, the light goes on. This is not the borderline. This is not twilight or dawn where you're wondering, you know, something black or white, and you just can't tell. This is so clear that anybody, anybody you tell this story to would say that's outrageous. That's not how I want my border patrol agents to conduct conduct themselves. They're violating the Constitution. A blind person could see they're violating the Constitution, and that's the crux of everything else. Now, all these common law causes of action, which is a deliberate choice. They wanted to go with Arizona common law. There's enough there to go to a jury under the common law to go to a trier of fact, and that's what should have happened here. And then on the intentional infliction, I submit to the court that that was error of grave magnitude, that these facts support the notion that these agents intentionally wanted to inflict as much emotional distress on that man as they possibly could, and on the other members of his family. They wanted them stressed. Oh, I thank the court. On your intentional You're supposed to view the evidence in the light most favorable to the prevailing party, which here would be the government. Don't you think that reviewing the testimony of Agent Casillas would be important? Yes, sure. But he didn't really deny. Well, I take that back. Did you designate that part of the record? His testimony? Yes. I think it's set out pretty clearly in the basically he didn't do anything wrong, and he denied what Mr. Armando said and what the wife and son said. He denied it all. But doesn't rule 10B2 require you to include a transcript of his testimony for us to review? I mean the trial testimony? Yes. I don't think so. On something like this, where it is, it's evident, I believe, as a matter of fact, based on the undisputed facts that this was intentional infliction of emotional distress. I mean, what's really going on is a characterization of what happened. The federal agents characterize it as well, mere aggressive testimony, and we characterize it as more what it was. They intended to inflict emotional distress, and they did. I mean, I don't think we violated anything about transcripts in that sort of a fundamental question. There's really no dispute about it. Thank you. Well, thank you, Your Honor. Okay, thank both sides for their arguments. And Davis Martinez versus United States now submitted for decision.
judges: W. Fletcher, Ikuta, Schreier